# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DARRELL MILES WALKER,

        Defendant-Appellant.

UNPUBLISHED
May 19, 2016

No. 324672
Wayne Circuit Court
LC No. 14-006199-FC

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

LAFAYETTE DESHAWN UPSHAW,

        Defendant-Appellant.

No. 325195
Wayne Circuit Court
LC No. 14-006199-FC

Before: MURPHY, P.J., and CAVANAGH and RONAYNE KRAUSE, JJ.

PER CURIAM.

In Docket No. 324672, defendant Darrell Miles Walker appeals as of right his jury trial conviction of armed robbery, MCL 750.529. The trial court sentenced Walker as a fourth habitual offender, MCL 769.12, to 25 to 50 years' imprisonment for the conviction. In Docket No. 325195, defendant Lafayette Deshawn Upshaw appeals as of right his jury trial convictions of armed robbery, carrying a dangerous weapon with unlawful intent, MCL 750.226, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced Upshaw to 18 to 40 years' imprisonment for the armed robbery conviction, 1 to 5 years' imprisonment for the dangerous weapon conviction, and 2 years' imprisonment for the felony-firearm conviction. We affirm.

## I. FACTS

This case stems from the armed robbery of a gas station. In that business establishment, the cashier's work station was enclosed by a wall that had bullet proof glass built into it and a door, which the cashier could utilize to access the customer area of the gas station. Walker

-1-

entered the gas station around 3:30 a.m. on May 28, 2014, and asked the cashier for help locating the coffee machine. The cashier testified that Walker was behaving strangely and that he did not go straight to the coffee machine when she pointed to its location; instead, Walker circled around some coolers and then made his way to the coffee machine. According to the cashier, Walker then just stood at the coffee machine, so the cashier opened her access door, stepped out into the customer area, and asked Walker if he needed assistance. Walker stood there silently, and the cashier explained to him how to use the coffee machine. She then went back to her work station, closing and locking the access door behind her.

The cashier testified that two women were also in the gas station at the time and that one of them came up to the counter, as Walker remained at the coffee machine. The cashier next heard a man's voice demanding money. The man, later identified as Upshaw, robbed the female customer, who proceeded to run and hide behind some shelving. Upshaw then turned his attention to the cashier, yelling at her to give him the money from the cash register, but she did not comply. During the next few moments, Upshaw discharged his firearm six times in the direction of the cashier and the enclosure and tried to knock and kick open the access door. The cashier was shielded by the bullet proof glass, and Upshaw was unsuccessful in his attempt to break into the cashier's work station. The cashier noticed that during this intense altercation, Walker remained standing at the coffee machine. She further observed that when Upshaw pointed his gun in Walker's general direction, Walker did not run. The cashier testified that Walker shouted at her to open the access door, indicating that the cashier should do so in order to simply end the situation and get Upshaw out of the gas station. The cashier, however, stood her ground and did not comply. Upshaw gave up and ran out of the gas station. Walker then ran up to the counter, told the cashier that she needed to call the police, and then fled in the same direction as the shooter.

A few hours later, Walker and Upshaw were arrested in the process of committing a home invasion at a residence in Detroit. The pair were caught as they exited separate windows of the house. Walker and Upshaw had attempted to steal several items of jewelry. The cashier later identified both Walker and Upshaw in separate photographic lineups, indicating that Walker had been the man standing at the coffee machine and that Upshaw had been the person who brandished and discharged the firearm in the gas station. The gas station's surveillance cameras produced footage of the armed robbery, which was displayed to the jury. Defendants were charged with the armed robbery and related crimes, but were not charged in these proceedings with the home invasion offense. Evidence of defendants' participation in the home invasion, however, was presented at trial. At the trial, Walker's defense was that he had merely been present at the gas station during the armed robbery and thus was not guilty as an aider and abettor, while Upshaw's defense challenged the evidence placing him at the gas station during the armed robbery.

## I. DOCKET NO. 324672

On appeal, Walker first argues that the evidence was insufficient to support his armed robbery conviction on an aiding and abetting theory, given that he was merely present at the gas station when the robbery occurred. Because we find the issues interrelated, we will also address, in the context of the sufficiency argument, Walker's second argument on appeal, which is that the trial court erred under MRE 401-403 by failing to exclude evidence of Walker's participation in the home invasion.

We review de novo the issue regarding whether there was sufficient evidence to sustain a conviction. *People v Lueth*, 253 Mich App 670, 680; 660 NW2d 322 (2002). In reviewing the sufficiency of the evidence, this Court must view the evidence – whether direct or circumstantial – in a light most favorable to the prosecutor and determine whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt. *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012); *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). A jury, and not an appellate court, observes the witnesses and listens to their testimony; therefore, an appellate court must not interfere with the jury's role in assessing the weight of the evidence and the credibility of the witnesses. *People v Wolfe*, 440 Mich 508, 514-515; 489 NW2d 748 (1992). Circumstantial evidence and reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of the crime. *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999). The prosecution need not negate every reasonable theory of innocence, but need only prove the elements of the crime in the face of whatever contradictory evidence is provided by the defendant. *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). We resolve all conflicts in the evidence in favor of the prosecution. *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008).

"Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense." MCL 767.39. "The phrase 'aids or abets' is used to describe any type of assistance given to the perpetrator of a crime by words or deeds that are intended to encourage, support, or incite the commission of that crime." *People v Moore*, 470 Mich 56, 63; 679 NW2d 41 (2004) (citation omitted). To show that a defendant engaged in aiding or abetting the commission of a crime, the prosecution must establish the following elements:

> "(1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement." [*Carines*, 460 Mich at 757 (citation omitted); see also *People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006).]

However, "[m]ere presence, even with knowledge that an offense is about to be committed or is being committed, is not enough to make a person an aider or abettor; nor is mere mental approval, passive acquiescence or consent sufficient." *People v Turner*, 125 Mich App 8, 11; 336 NW2d 217 (1983); see also *People v Norris*, 236 Mich App 411, 419-420; 600 NW2d 658 (1999).

In the instant case, the evidence was sufficient to show that Walker was not merely present in the gas station at the time of the armed robbery but that he aided or abetted in the robbery. Walker's odd behavior in the gas station before and during the robbery, described above, his lack of a normal reaction to the robbery, his attempt to convince the cashier to open the access door, and his quick departure upon Upshaw's exit from the gas station, all suggested that Walker played a role in the armed robbery and was not merely present at the scene. The evidence that removes any lingering doubt on the issue is Walker and Upshaw's joint participation in the home invasion a few short hours later. This evidence revealed that a relationship existed between the two men, rendering any conduct by Walker at gas station

that arguably may have outwardly appeared innocent, damning and inculpatory. Taking into consideration the evidence of Walker's conduct at the gas station in conjunction with the home invasion evidence, there existed sufficient circumstantial evidence that Walker encouraged, supported, and assisted in the armed robbery, i.e., that he aided and abetted Upshaw in the robbery. Reasonable inferences arising from the evidence include that Walker was "casing" or surveilling the gas station, that he was attempting to distract the cashier, that his conduct had been designed to lure the cashier from her work station and open the access door, which did briefly occur, that he was there to help contain or address any unexpected interference with the robbery, and/or that he was there to assist in completion of the robbery if Upshaw needed assistance. Indeed, Walker's attempt to convince the cashier to open the access door, in and of itself, was evidence of him providing aid and assistance to Upshaw, as had Walker been successful in essentially tricking the cashier into opening the door, Upshaw in all likelihood would have been able to empty the cash register. In sum, the evidence, when viewed in a light most favorable to the prosecution, with all conflicting evidence being resolved in favor of the prosecution, was more than sufficient to support Walker's conviction for armed robbery under an aiding and abetting theory.[1]

Next, in light of the importance of the evidence of the home invasion in showing a relationship between Walker and Upshaw, said evidence was relevant, as it made it more probable that Walker had aided and abetted Upshaw relative to the armed robbery – a disputed fact that was of consequence to the determination of the armed robbery charge. MRE 401. Moreover, the probative value of the home invasion evidence, which was high, was not substantially outweighed by the danger of unfair prejudice. MRE 403.[2] Accordingly, the evidence concerning the home invasion was admissible. MRE 402. We note that Walker does not argue that MRE 404(b) barred admission of the evidence and that, had he made the argument, it would fail, because the evidence was not admitted to show Walker's character or his propensity to engage in criminal activity. *People v Jackson*, 498 Mich 246, 258-259; 869 NW2d

---

[1] In a brief filed pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4, defendant also presents a sufficiency argument regarding the armed robbery conviction, effectively raising the same issues that we have just rejected. Defendant further maintains that counsel was ineffective for failing to move for a directed verdict on the armed robbery charge because of the insufficiency of the evidence; however, counsel is not ineffective for failing to raise a meritless or futile motion. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

[2] Although all relevant evidence is prejudicial to some extent, *People v Murphy (On Remand)*, 282 Mich App 571, 582-583; 766 NW2d 303 (2009), evidence may be considered unfairly prejudicial only if the evidence injects "considerations extraneous to the merits of the lawsuit, e.g., the jury's bias, sympathy, anger, or shock." *People v Pickens*, 446 Mich 298, 337; 521 NW2d 797 (1994) (citation and quotation marks omitted). Unfair prejudice exists when there is a probability that the evidence, which is minimally damaging in logic, will be weighed by the jurors substantially out of proportion to its logically damaging effect, or when it would be inequitable to allow the prosecution to utilize the evidence. *Murphy*, 282 Mich App at 583. Here, there is no indication that the evidence injected considerations extraneous to the merits of the case, or that the jury gave it undue or preemptive weight.

253 (2015). Rather, the home invasion evidence was introduced for the proper purpose of showing the existence of a connection or relationship between Walker and Upshaw.[3] The trial court did not abuse its discretion or otherwise err in admitting the evidence of the home invasion. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999).

Walker finally contends, in his standard 4 brief, that the trial court deprived him of a fair trial by failing to properly instruct the jury on prior inconsistent statements used to impeach witnesses. The trial court rejected Walker's request to instruct the jury pursuant to M Crim JI 4.5, which addresses prior inconsistent statements made by witnesses and directs jurors to only consider such statements with respect to deciding whether a witness testified truthfully in court and not as substantive evidence. On appeal, defendant fails to actually identify any prior inconsistent statements made by the cashier or any other witness used for impeachment, nor can we locate any. The trial court is not required to give a requested instruction when it is unsupported by the evidence or record. *People v Mills*, 450 Mich 61, 81; 537 NW2d 909 (1995). Accordingly, the trial court did not abuse its discretion in determining that the omitted instruction concerning prior inconsistent statements was inapplicable to the facts of the case. *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006).

III.   DOCKET NO. 325195

Upshaw first argues that the trial court abused its discretion in granting the prosecutor's motion to endorse a key witness – the owner of the house involved in the home invasion – on the second day of trial over Upshaw's objection. Assuming that the prosecutor lacked good cause to add the witness at such a late date, MCL 767.40a(4), and that the trial court abused its discretion in allowing the late endorsement and the home owner to testify, Upshaw has not demonstrated that the court's ruling resulted in any prejudice, *People v Callon*, 256 Mich App 312, 328; 662 NW2d 501 (2003). Upshaw has failed to meet that burden, presenting only a vague argument that he was "deprived of a fair trial and denied the opportunity to develop an adequate defense." The home owner briefly testified about the condition of her house as damaged by the intruders and the items taken in the home invasion, indicating that defendants did not have her permission to enter the house. Prior to her testimony, two police officers who responded to the home invasion testified about observing a broken window, apprehending Walker and Upshaw after they climbed out of or leaped from windows, and finding jewelry on Walker, which evidence plainly revealed that a home invasion had occurred. The home owner's testimony added little

---

[3] In *People v Mardlin*, 487 Mich 609, 615-616; 790 NW2d 607 (2010), the Michigan Supreme Court stated:

> Evidence relevant to a noncharacter purpose is *admissible* under MRE 404(b) *even if* it also reflects on a defendant's character. Evidence is *inadmissible* under this rule *only* if it is relevant *solely* to the defendant's character or criminal propensity. Stated another way, the rule is not exclusionary, but is inclusionary, because it provides a nonexhaustive list of reasons to properly admit evidence that may nonetheless also give rise to an inference about the defendant's character. [Citations omitted.]

and certainly did not prejudice Upshaw in light of the untainted and unchallenged police testimony about the home invasion.

Upshaw next contends that he was denied a fair trial when the trial court allowed the admission of testimony that Upshaw had refused to participate in a live lineup. We first hold that Upshaw's refusal to participate in the lineup did not implicate his Fifth Amendment privilege against self-incrimination. *United States v Wade*, 388 US 218, 222-223; 87 S Ct 1926; 18 L Ed 2d 1149 (1967); *People v Benson*, 180 Mich App 433, 437; 447 NW2d 755 (1989), rev'd in part on other grounds 434 Mich 903 (1990). In *Wade*, 388 US at 222-223, the United States Supreme Court observed:

> We have no doubt that compelling the accused merely to exhibit his person for observation by a prosecution witness prior to trial involves no compulsion of the accused to give evidence having testimonial significance. It is compulsion of the accused to exhibit his physical characteristics, not compulsion to disclose any knowledge he might have. It is no different from compelling . . . a blood sample or [a defendant] to wear the blouse, and, as in those instances, is not within the cover of the privilege. Similarly, compelling Wade to speak within hearing distance of the witnesses, even to utter words purportedly uttered by the robber, was not compulsion to utter statements of a "testimonial" nature; he was required to use his voice as an identifying physical characteristic, not to speak his guilt. We [have] held . . . that the distinction to be drawn under the Fifth Amendment privilege against self-incrimination is one between an accused's "communications" in whatever form, vocal or physical, and compulsion which makes a suspect or accused the source of real or physical evidence. We recognized that both federal and state courts have usually held that . . . the privilege[] offers no protection against compulsion to submit to fingerprinting, photography, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. None of these activities becomes testimonial within the scope of the privilege because required of the accused in a pretrial lineup. [Citations, quotation marks, and ellipsis omitted.]

Upshaw, however, maintains that the evidence was irrelevant and unduly prejudicial. We find Upshaw's reliance on drunk driving cases inapposite, considering that statutory language played a role in those decisions. See, e.g., *People v Reeder*, 370 Mich 378; 121 NW2d 840 (1963); *People v Duke*, 136 Mich App 798; 357 NW2d 775 (1984); MCL 257.625a(9). We tend to believe that evidence of a refusal to participate in a lineup is akin to evidence of flight from a crime scene, which is admissible to support an inference of consciousness of guilt. See *People v Goodin*, 257 Mich App 425, 432; 668 NW2d 392 (2003) (addressing flight); see also *United States v Ashburn*, 76 F Supp 3d 401, 445 (ED NY, 2014); *People v Alexander*, 49 Cal 4th 846, 924-925; 113 Cal Rptr 3d 190; 235 P2d 873 (2010) (evidence that the defendant refused to participate in a lineup was admissible to show his consciousness of guilt). Regardless, we agree with the prosecution that, assuming error, Upshaw has not established prejudice, where the cashier identified him in a photographic array, where the jury observed video surveillance footage of the robbery, and where Upshaw was caught with Walker a few hours later during the home invasion. MCL 769.26; *Lukity*, 460 Mich at 495.

-6-

Next, Upshaw contends that he was deprived of his Sixth Amendment right to the effective assistance of counsel, where counsel failed to investigate potential alibi witnesses and failed to file the required notice of intent to present an alibi defense, MCL 768.20.[4] At trial, Upshaw called to the stand the manager of a restaurant where Upshaw was employed at the time of the robbery, and the manager testified that he drove Upshaw home at the end of his shift, dropping him off about 15 minutes before the robbery was committed. The manager, however, did not know Upshaw's whereabouts at the exact time of the robbery. On appeal, Upshaw argues that he remained home after being dropped off by the manager and that his aunt, grandmother, and girlfriend were also present at the home at the time. Upshaw attached his own affidavit to his appellate brief in an attempt to support his contention, merely implying that these three individuals could have provided him an alibi defense. However, Upshaw did not attach any affidavits from his aunt, grandmother, or girlfriend attesting to the claims, nor is there anything in the lower court record pertaining to alibis given by these individuals. In a second motion to remand filed with this Court, Upshaw had attached a document purportedly signed by his aunt, which did not meet the requirements of an affidavit, MCR 2.119(B), but his aunt merely asserted, "I was a alibi witness to some events that happened on May." This nonsensical statement did not provide an alibi. Upshaw had further attached a document purportedly signed by his grandmother, which also did not meet the requirements of an affidavit, MCR 2.119(B),

---

[4] Whether counsel was ineffective presents a mixed question of fact and constitutional law, which we review, respectively, for clear error and de novo. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). In *People v Carbin,* 463 Mich 590, 599-600; 623 NW2d 884 (2001), our Supreme Court, addressing the basic principles governing a claim of ineffective assistance of counsel, stated:

> To justify reversal under either the federal or state constitutions, a convicted defendant must satisfy the two-part test articulated by the United States Supreme Court in *Strickland v Washington,* 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). See *People v Pickens,* 446 Mich 298, 302-303; 521 NW2d 797 (1994). "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not performing as the 'counsel' guaranteed by the Sixth Amendment." *Strickland, supra* at 687. In so doing, the defendant must overcome a strong presumption that counsel's performance constituted sound trial strategy. *Id.* at 690. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim. See *People v Hoag,* 460 Mich 1, 6; 594 NW2d 57 (1999).

An attorney's performance is deficient if the representation falls below an objective standard of reasonableness. *People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000).

and his grandmother asserted that Upshaw had arrived home around the same time as claimed by Upshaw's manager or a few minutes later. The document implied or suggested that Upshaw remained at the home for several hours, but it did not expressly provide so, nor did his grandmother state that she observed him at the exact time of the robbery. Assuming that it is even proper to consider these flawed documents, Upshaw has simply failed to show that counsel's performance fell below an objective standard of reasonableness relative to alibi witnesses and a notice of alibi, and he has not established the requisite prejudice.

Upshaw next contends that the trial court abused its discretion when it denied his request for an adjournment to accommodate his newly-retained attorney. This argument is premised on the claimed need for time so that new counsel could have investigated and properly presented an alibi defense. Given our previous discussion, the alibi claims are unavailing. Upshaw has not shown that good cause existed as was necessary to grant a continuance or adjournment, and the trial court did not abuse its discretion in denying the adjournment request. *People v Coy*, 258 Mich App 1, 17-18; 669 NW2d 831 (2003).

Upshaw additionally argues that the prosecutor improperly exercised peremptory challenges, dismissing African-American members of the jury pool in violation of *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986). "Under the Equal Protection Clause of the Fourteenth Amendment, a party may not exercise a peremptory challenge to remove a prospective juror solely on the basis of the person's race." *People v Knight*, 473 Mich 324, 335-336; 701 NW2d 715 (2005) (citations omitted). Our Supreme Court in *Knight* stated that *Batson* "announced a three-step process for determining the constitutional propriety of a peremptory challenge." *Knight*, 473 Mich at 336. "First, the opponent of the peremptory challenge must make a prima facie showing of discrimination." *Id.* With respect to this first step, we review for clear error any underlying factual findings, while related questions of law are subject to de novo review. *Id.* at 343. "Second, if the trial court determines that a prima facie showing has been made, the burden shifts to the proponent of the peremptory challenge to articulate a race-neutral explanation for the strike." *Id.* at 337. "[T]he de novo standard governs appellate review of . . . [this] second step." *Id.* at 344. "Finally, if the proponent provides a race-neutral explanation as a matter of law, the trial court must then determine whether the race-neutral explanation is a pretext and whether the opponent of the challenge has proved purposeful discrimination." *Id.* at 337-338. "[T]he clear error standard governs appellate review of a trial court's resolution of . . . [this] third step." *Id.* at 345.

In the instant case, after the prosecutor exercised multiple peremptory challenges, Upshaw's attorney informed the trial court that he had a motion to make. The trial court excused the veniremembers and those remaining in the jury pool. Upshaw's counsel then presented a *Batson* challenge, arguing that six of the eight peremptory challenges exercised by the prosecutor pertained to African-Americans; both defendants are African-American. Walker's attorney indicated that he would join in the motion. Other than noting the number of peremptory challenges exercised by the prosecutor and the race of those excused veniremembers, the defense attorneys did not provide any additional argument in support of making a prima facie case of discrimination. The trial court, failing to indicate whether defendants had made the required prima facie showing of discrimination, asked the prosecutor whether she had any response as to why the African-American veniremembers were excused. The prosecutor then provided race-neutral explanations for the strikes in regard to four of the African-American veniremembers. Before the prosecutor could continue with her explanations concerning the remaining two

-8-

African-American veniremembers, the trial court interjected, asking Upshaw's counsel whether he had any response. Upshaw's attorney then began addressing and challenging the race-neutral explanation given by the prosecutor in regard to one of the stricken veniremembers. The trial court quickly chimed in, "Yes, but are you saying that's a pretext to get her off the jury because she's black?" Upshaw's counsel replied in the affirmative, at which point the trial court queried, "Anything else?" Upshaw's attorney replied, "No, your Honor." Walker's attorney also indicated that he had nothing to add.

Next, the trial court ruled:

> Well, the [p]rosecutor has given some explanation other than race being challenged. I don't think the *Batson* motion can be sustained. I don't have any further comments on whether it's good or bad. . . . .

After some further discussion on the matter, Upshaw's attorney began challenging the race-neutral explanation given by the prosecutor regarding another veniremember, but the trial court interrupted, making clear that it had denied the *Batson* motion.

In *Knight*, 473 Mich at 339, our Supreme Court counseled the bench with respect to *Batson* challenges, stating that "trial courts must meticulously follow *Batson*'s three-step test, and we *strongly* urge our courts to *clearly* articulate their findings and conclusions on the record." The Court further noted that "[w]hen a trial court methodically adheres to *Batson*'s three-step test and clearly articulates its findings on the record, issues concerning what the trial court has ruled are significantly ameliorated." *Id.* at 338-339. Here, unfortunately, the trial court failed to adhere to the directive announced by the *Knight* Court a decade earlier.

With respect to the first step, i.e., whether defendants made a prima facie showing of discrimination, actual proof of discrimination is not required. *Id.* at 336. And, given that there is no dispute that the veniremembers at issue in this case were members of a cognizable racial group and that peremptory challenges were exercised to exclude them from the jury, the question in regard to step one becomes whether all of the relevant circumstances raised *an inference* that the prosecutor struck the excluded veniremembers on the basis of race. *Id.* The trial court's statements on the bench failed to expressly indicate whether it found that defendants had made a prima facie case of discrimination. Although such a finding might be implied because the court asked the prosecutor to articulate explanations for why veniremembers were stricken, the court's ruling is ultimately unclear and muddled on the matter. We cannot conclude, on the existing record, that defendants made a prima facie showing or case of racial discrimination. While not binding precedent, we find persuasive the following discussion by the United States Court of Appeals for the Eleventh Circuit in *United States v Ochoa-Vasquez*, 428 F3d 1015, 1044 (CA 11, 2005):

> In order to determine whether a *Batson* objector . . . has established a prima facie case of discrimination, courts must consider all relevant circumstances. This Court has cautioned that the mere fact of striking a juror or a set of jurors of a particular race does not necessarily create an inference of racial discrimination. While statistical evidence may support an inference of discrimination, it can do so only when placed in context. For example, the number of persons struck takes on meaning *only* when coupled with other information

such as the racial composition of the venire, the race of others struck, or the voir dire answers of those who were struck compared to the answers of those who were not struck. . . . . [Citations and quotation marks omitted.]

The Eleventh Circuit observed that pertinent circumstances to consider include the racial composition of remaining potential jurors, "the percentage of jurors of a particular race or ethnicity struck and the percentage of their representation on the venire," whether members of the relevant racial group served unchallenged on the jury, and whether the prosecutor used all or nearly all of his or her challenges to strike veniremembers of a particular race. *Id.* at 1044-1045. Here, the only argument posed by defense counsel during voir dire was that six of eight peremptory challenges exercised by the prosecutor concerned veniremembers of the same race as defendants. Neither Walker nor Upshaw's attorney made a record regarding any other surrounding circumstance, such as those alluded to in *Ochoa-Vasquez*, nor are we able to discern from the existing record whether additional relevant facts or circumstances were present, e.g., information regarding the percentage of African-American jurors on the venire. Assuming that the trial court found that defendants had made a prima facie case of discrimination, it erred in that part of its analysis. Absent a prima facie showing of discrimination, the remaining two steps in the *Batson* analysis are rendered moot.[5] Reversal is unwarranted.

Finally, Upshaw maintains that the trial court erred when it assessed offense variable (OV) 14, MCL 777.44, at 10 points, which is the proper score when "[t]he offender was a leader in a multiple offender situation," MCL 777.44(1)(a). The trial court assessed 10 points because "[t]he proofs showed that Mr. Upshaw entered the gas station and began firing multiple shots." Upshaw argues that this evidence did not support the conclusion that he was the leader, as between himself and Walker. Although Upshaw alludes to our Supreme Court's ruling in *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015), he ultimately does not contend that he is entitled to a *Crosby* remand[6] under *Lockridge*. With respect to OV 14, in *People v Rhodes (On Remand)*, 305 Mich App 85, 90; 849 NW2d 417 (2014), the trial court relied on the fact that the defendant had the gun and not the codefendant in assessing 10 points, and this Court reversed, ruling:

> The Legislature did not define by statute what constitutes a leader for the purposes of OV 14. We have not found any binding caselaw defining "leader" in this context. Consequently, we turn to the dictionary. According to *Random House Webster's College Dictionary* (2001), a "leader" is defined in relevant part as "a person or thing that leads" or "a guiding or directing head, as of an army or political group." To "lead" is defined in relevant part as, in general, guiding, preceding, showing the way, directing, or conducting. The evidence unequivocally supports the trial court's factual determination that defendant

---

[5] That said, we do note that the prosecutor provided race-neutral explanations with respect to four of the struck African-American veniremembers before being cut off by the trial court, and the defense attorneys only spoke in regard to one or two of those veniremembers for purposes of claiming pretext.

[6] This is a reference to *United States v Crosby*, 397 F3d 103 (CA 2, 2005).

possessed a gun and the only other person involved in the criminal transaction did not. However, the evidence does not show that defendant acted first, gave any directions or orders to [the codefendant], displayed any greater amount of initiative beyond employing a more dangerous instrumentality of harm, played a precipitating role in [the codefendant's] participation in the criminal transaction, or was otherwise a primary causal or coordinating agent.

We remain of the opinion that defendant's exclusive possession of a gun during the criminal transaction is *some* evidence of leadership, however it does not meet the preponderance of the evidence standard . . . . [Citation omitted.]

The instant case can be distinguished from *Rhodes*. Here, Upshaw not only possessed a gun, he repeatedly and violently discharged the weapon. Further, while Walker may have been surveilling the gas station, it was Upshaw who ultimately acted first with respect to actually perpetrating and committing the armed robbery. Also, it was Upshaw who made demands of and robbed the female customer, it was Upshaw who ordered the cashier to give him the money from the cash register, and it was Upshaw who attempted to kick or break down the access door, all while Walker, for the most part, sat back and observed from a distance. And, Walker followed Upshaw out of the gas station after the partially foiled robbery, as opposed to taking any independent steps upon Upshaw's departure to somehow complete the crime. For purposes of actually carrying out the robbery, Upshaw outwardly displayed the greater amount of initiative. Although there are unknowns regarding the nature of the relationship between the two defendants, we cannot conclude on the basis of the evidence and reasonable inferences arising therefrom that the trial court clearly erred in finding by a preponderance of the evidence that Upshaw was the leader with respect to the armed robbery. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013).

Affirmed.

/s/ William B. Murphy
/s/ Mark J. Cavanagh
/s/ Amy Ronayne Krause

-11-